**In the Matter of Carlos W. GALBREATH, Debtor.**

**J. Coleman TIDWELL, Trustee, Plaintiff,**

**v.**

**Glenda P. GALBREATH, The Money Store Investment Corporation, and Solid Rock Assembly of God, Inc., Defendants.**

**Bankruptcy No. 94-40445 RFH.**
**Adversary No. 95-4056.**

United States Bankruptcy Court,
M.D. Georgia,
Columbus Division.

March 28, 1997.

Thomas W. Talbot, Macon, GA, for J. Coleman Tidwell.

Ray L. Allison, Columbus, GA, for Glenda P. Galbreath.

Kirby R. Moore, Macon, GA, for The Money Store Investment Corporation.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

J. Coleman Tidwell, Chapter 7 Trustee, Plaintiff, filed on July 14, 1995, a complaint against three defendants. Glenda P. Galbreath (hereinafter "Defendant") filed a response on August 14, 1995. The Money Store Investment Corporation (hereinafter "The Money Store") filed a response on August 28, 1995. The third defendant, Solid Rock Assembly of God, Inc. failed to file a response, and the Court entered a judgment by default on May 16, 1996.

The Court entered an order on May 22, 1996, allowing Plaintiff to amend his complaint. Defendant and The Money Store filed responses to Plaintiff's amended complaint. Plaintiff's complaint came on for trial on October 29, 1996. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Defendant and Carlos W. Galbreath, Debtor, were married in 1958. Defendant worked while Debtor attended dental school. Debtor was a practicing dentist until he became disabled in April of 1993. Defendant worked in Debtor's dental office. Defendant and Debtor have three children who are now adults. Defendant and Debtor have lived in the marital residence for twenty-five years.

Defendant, for a number of years, suspected that Debtor was having an extramarital affair. Defendant's suspicions were confirmed in 1991. Debtor moved from the marital bedroom in August of 1991. Debtor continued to live in the marital residence, but slept downstairs.

Defendant received counseling to help her deal with her marital problems. The counselor suggested that Defendant obtain from Debtor a post-nuptial agreement.[1] Defendant decided to pursue the suggestion.

---

1. Black's Law Dictionary defines post-nuptial agreement as follows:

Defendant met with Milton Hirsch in September of 1991. Mr. Hirsch is an attorney whose practice is limited to family law. Mr. Hirsch, at Defendant's request, prepared a post-nuptial agreement (hereinafter the "October 4, 1991, Agreement"), which provides, in part:

This Document is an Agreement entered into between two married parties for the purpose of avoiding litigation and embarrassment and for the purpose of settling their differences in the event the parties should as described herein subsequently have to separate either temporarily or permanently, the parties being GLENDA P. GALBREATH, Wife and C.W. GALBREATH, Husband, and this agreement shows as follows:

WHEREAS, the parties hereto are living in a bona fide state of separation and

WHEREAS, said separation has resulted from certain misconduct on the part of the Husband and

WHEREAS, the parties do not wish to break up their home and seek a divorce at this time, but

WHEREAS, the parties do desire to settle the terms and conditions of such a separation and/or divorce in the event a divorce or separation may occur.

NOW, THEREFORE, in consideration of the mutual covenants herein contained the parties agree to the following:

1.

The parties agree that until such time as Wife shall determine to change the arrangement that they will share the home at 558 Cumberland Drive, Columbus, Muscogee County, Georgia 31904.

2.

The parties further agree that they will make the following equitable distribution of the marital property:

Section 2 of the agreement provides that Debtor would transfer to Defendant either one-half or all of Debtor's interest in certain real property, personal property, and business interests. Section 2(d) of the agreement provides:

(d) Husband in the event of a divorce between these parties agrees that he will put his dental practice on the market for sale and that Wife will receive one-half of the proceeds and that said sale will be a bona fide sale for a reasonable and fair market value.

Section 3 provides that Debtor would make certain alimony payments to Defendant. Sections 6 and 7 of the agreement provide:

6.

The parties agree to execute all necessary documents required to prepare a more detailed agreement if necessary and all documents required to carry out the terms of this instrument as [herein stated] should no other document be agreed upon.

7.

In the event a divorce is filed or an action for alimony without a divorce is filed by either party, the terms of this agreement shall be made the Final Judgment and Decree of the Court in such action.

Defendant confronted Debtor at the marital residence on October 4, 1991. Debtor was shocked to learn that Defendant had discovered that he was having an affair. The three children of Defendant and Debtor were present at the request of Defendant. Defendant presented the October 4, 1991, Agreement to Debtor. Debtor believed that he had no choice but to sign the agreement. Debtor believed that Defendant would divorce him if he refused. Debtor believed that Defendant "deserved" the property that she demanded in the agreement. Debtor agreed to end his affair. Defendant wanted the property regardless of whether Debtor ended his affair. Defendant and Debtor signed the agreement. Their three children signed as witnesses. Debtor received no money for signing the agreement. Debtor

**Post-nuptial agreement.** Post-nuptial agreements or settlements are made after marriage between couples still married; they take the form of separation agreements, property settlements in contemplation of a separation or divorce, or property settlements where there is no intention of the parties to separate.
Black's Law Dictionary 1167 (6th ed. 1990).

continued to sleep downstairs in the marital residence.

Defendant was willing, until the end of October of 1991, to reconcile and cohabit with Debtor. Debtor, however, continued his extramarital affair. Defendant met with Mr. Hirsch in January of 1992 and told him that she wanted a divorce. At Defendant's request, Mr. Hirsch prepared a Post Nuptial Agreement, which was signed by Defendant and Debtor on March 23, 1992 (hereinafter the "March 23, 1992, Agreement"). Debtor was still sleeping downstairs in the marital residence. The March 23, 1992, Agreement provides, in part:

### POST NUPTIAL AGREEMENT

GEORGIA, MUSCOGEE COUNTY:

THIS AGREEMENT made and entered into this the 23rd day of March, 1992, by and between GLENDA P. GALBREATH, hereinafter called "Wife," and C.W. GALBREATH, hereinafter called "Husband," both of Muscogee County, Georgia,

### SHOWETH:

WHEREAS, the parties hereto are living in a bona fide state of separation, and

WHEREAS, the parties do not wish to break up their home and seek a legal separation in Court or a divorce in Court, and,

Whereas they did execute an agreement dated October 4, 1991, in which agreement the terms of such legal separation or divorce are detailed, and,

WHEREAS, said parties wish to formalize said agreement, execute the necessary documents, transferring titles and/or equities in certain real property and certain personal property, and to have such deeds and/or transfers recorded where necessary, in the sincere hope that the parties in so doing will be able to continue their efforts toward a reconciliation without the doubt and agony of future litigation, and

WHEREAS, the parties confirm that the agreement dated October 4, 1991, is fair and equitable in the light of this long marriage and the fact that the Wife is not the party at fault in this separation.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the execution of the deeds, documents, and transfers executed in conjunction herewith, and in the special consideration for the Wife reconciling with Husband and renewed cohabitation, the parties agree as follows:

1.

That certain agreement between the parties hereto made and executed on the 4th day of October, 1991, is hereby ratified and confirmed and a copy thereof is attached to this agreement for reference and identification. The parties acknowledge that they are sharing the home at 558 Cumberland Drive, Columbus, Muscogee County, Georgia, harmoniously under the circumstances and confirm that they will continue to do so until such time as either party elects to terminate such arrangement.

Pursuant to the October 4, 1991, Agreement and the March 23, 1992, Agreement, Debtor executed four deeds dated March 23, 1992, in favor of Defendant. Each deed stated that the consideration was "love and affection which Grantor [Debtor] has for his wife, the Grantee [Defendant] herein." The deeds were prepared by Defendant's attorney, Mr. Hirsch. Mr. Hirsch testified that love and affection was part of the consideration because Defendant and Debtor were going to attempt to reconcile their marital problems. The deeds were timely filed for record. Debtor received no money for executing the deeds. Debtor believed that the conveyances were not gifts, but were a division of the marital property. Debtor believed that Defendant would go forward with obtaining a divorce.

The first deed conveyed to Defendant one-half of Debtor's interest in his dental office building located at 4401 Armour Road, Muscogee County, Georgia. The second deed conveyed to Defendant one-half of Debtor's interest in real property located in Marion County, Georgia. The third deed conveyed to Defendant all of Debtor's interest in the

marital residence[2] along with all the household furnishings. The final deed conveyed to Defendant all of Debtor's interest in a condominium located in White County, Georgia.

The March 23, 1992, Agreement states that Debtor agrees to: (1) hold one-half of his interest in the Mobley Road property and in Gabby, Inc. in trust in favor of Defendant; (2) immediately convey one-half of his certificates of deposit, savings, stocks and bonds, and other liquid assets to Defendant; and (3) convey to Defendant a 1991 Mercedes–Benz automobile.

Section (2)(f) of the March 23, 1992, Agreement provides "that in the event the parties [Defendant and Debtor] hereto obtain a legal separation or divorce [that Debtor's IRA and profit sharing accounts] will be divided equally by means of a Qualified Domestic Relations Order." Section (3)(a) provides that Defendant will receive a minimum of $5,200 per month as alimony if Defendant and Debtor divorce or legally separate.

Section 9 of the March 23, 1992, Agreement provides: "The parties [Defendant and Debtor] hereto agree that this Agreement shall be made a part of a temporary order and the Final Judgment and Decree should either party seek a legal separation or divorce in a Court of proper jurisdiction."

Defendant and Debtor signed another Post Nuptial Agreement on March 30, 1992 (hereinafter the "March 30, 1992, Agreement"). This agreement is identical to the March 23, 1992, Agreement except that the March 30, 1992, Agreement increases the amount of alimony Defendant would receive to $7,200 per month. The March 30, 1992, Agreement also provides that Defendant would receive one-half of the sales price from the sale of Debtor's dental practice.[3] Debtor received no money for signing the March 23, 1992, Agreement or the March 30, 1992, Agreement.

Defendant and Debtor did not, at this time, reconcile or cohabit. Defendant opened a checking account solely in her name in April of 1992. Debtor was not aware of

the account and had no signature authority on the account.

Debtor went on a trip with his church. When he returned in early May of 1992, he found a letter from Defendant ordering him to leave the marital residence. Debtor moved to a nearby community and lived with an elderly friend. Defendant stopped working in Debtor's dental office in May of 1992.

Defendant, through her attorney, filed in state court a complaint for divorce on May 5, 1992. Debtor signed an acknowledgment of service of the divorce action. The complaint states, in part:

5.

Plaintiff is entitled to a divorce from the Defendant because the marriage is irretrievably broken and there is no reasonable hope for a reconciliation.

6.

Plaintiff shows that the parties hereto have entered into an agreement settling all issues pertaining to this matter, which said agreement is dated the 30th day of March, 1992, and this agreement should be made the Final Judgment and Decree of the Court.

7.

Plaintiff shows that said agreement was entered into in the hope of reconciling the parties differences and predicated upon the promise of the Defendant not to engage in the activities which caused the separation of these parties. Plaintiff shows that notwithstanding his promises, the Defendant continued to engage in such activities making it impossible for the Plaintiff to reconcile with him, although it was her sincere hope and desire that the parties could, in fact, reconcile their differences.

In early 1993, Mr. Hirsch told Defendant that she needed to proceed with her divorce action because the action was appearing on

---

**2.** Debtor's financial statements dated May 15, 1991, and May 14, 1992, show that title to the marital residence had been held solely by Debtor.

**3.** This provision was in the October 1991 Agreement, but was erroneously omitted from the March 23, 1992, Agreement.

the state court's trial docket. Neither Defendant nor Debtor had commenced any discovery in the divorce action. Defendant decided to dismiss her complaint for divorce in March of 1993. Defendant did not inform Debtor that the divorce complaint had been dismissed.

Debtor seriously injured his hand on April 2, 1993. He was unable to practice dentistry. Debtor moved back into the marital residence in April of 1993. Defendant allowed this because the elderly friend with whom Debtor was living was unable to care for Debtor. Defendant and Debtor reconciled and cohabited in May of 1993.

Defendant and Debtor employed outside dentists to operate Debtor's dental practice while Debtor received rehabilitation therapy. Debtor, however, was not able to return to his dental practice. Debtor began receiving disability income in late 1993 or early 1994.

Debtor sold his dental practice in January of 1994.[4] The sales price was $135,000. Debtor paid a broker's commission of $6,500. Debtor gave Defendant the $128,500, which was the net sale proceeds. Defendant deposited the $128,500 into her checking account.

Defendant issued a check dated January 24, 1994, payable to The Money Store in the amount of $64,596.27. The check was signed by Defendant and issued on her checking account. This payment satisfied the lien on the marital residence. Debtor was the obligor on this obligation. Defendant had no personal liability on the obligation. The residence was not encumbered by any other liens.

Defendant used the remainder of the sale proceeds to pay various bills. Defendant paid $12,900 for Debtor's church tithe. Defendant paid about $35,000 to an attorney who had represented Debtor in a federal mail fraud case. Defendant paid an amount less than $5,000 to Barnett Bank to satisfy their son's loan. Defendant did not recall at trial to whom the remaining funds were paid.

Thus, Defendant used $112,496.27 of the sale proceeds to pay obligations owed by Debtor.

Debtor had invested in a number of restaurants known as Gabby's. The investments began around 1991. Debtor did not discuss with Defendant the operation or financial condition of Gabby's or his financial exposure in the investments. The restaurants were not successful.

Defendant first learned in March of 1994 that Debtor would seek bankruptcy relief. Defendant did not know of Debtor's financial problems until that time. Debtor filed a petition under Chapter 7 of the Bankruptcy Code on April 29, 1994. Unsecured creditors of Debtor's bankruptcy estate will not receive a 100 percent dividend on their claims.

The evidence presented shows that Debtor had a number of unsecured creditors in March of 1992. Debtor published five financial statements between January of 1990 and May of 1992.[5] In the financial statements, Debtor values his assets at about $1,000,000 and his liabilities at about $225,000. The financial statements do not fully disclose Debtor's financial exposure on his Gabby's restaurant investments.

The marital problems between Defendant and Debtor were very real. Debtor testified that he did not sign the three post-nuptial agreements or four deeds with the intent to hinder, delay, or defraud his creditors. The execution of the agreements and the deeds did not cause the financial problems which led to Debtor's bankruptcy filing.

Debtor plead guilty to a charge of federal mail fraud in 1994. Debtor has completed his sentence. Defendant and Debtor are currently living together as husband and wife in the marital residence.

### CONCLUSIONS OF LAW

Plaintiff seeks to avoid the transfers made by Debtor in favor of Defendant. Plaintiff argues that the transfers may be avoided

---

**4.** The sale of Debtor's dental practice did not include the real estate.

**5.** Three of the financial statements were joint statements of Defendant and Debtor. The same

assets and liabilities were, by and large, listed on both the joint financial statements and on Debtor's individual financial statements.

under section 544(b) of the Bankruptcy Code,[6] which provides:

> § 544. **Trustee as lien creditor and as successor to certain creditors and purchasers**
>
> . . . .
>
> (b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C.A. § 544(b) (West 1993).

■ A transaction that is voidable by a single, unsecured creditor may be avoided by Plaintiff to the extent necessary to benefit the bankruptcy estate, regardless of the size of the actual creditor's claim. The recovery is for the benefit of all unsecured creditors. *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931); 5 *Collier on Bankruptcy* ¶ 544.09[5], p. 544–20–2 (15th ed. rev. 1996).

Section 544(b) allows Plaintiff to pursue remedies that an actual unsecured creditor could have pursued had there been no bankruptcy proceeding. Under Georgia law, certain transfers by debtors are deemed fraudulent in law against creditors. Plaintiff argues that the transfers from Debtor to Defendant were fraudulent under Georgia Code section 18–2–22(3).[7] This section provides:

> 18–2–22. **Conveyances by debtors deemed fraudulent.**
>
> The following acts by debtors shall be fraudulent in law against creditors and others and as to them shall be null and void:
>
> . . . .
>
> (3) Every voluntary deed or conveyance, not for a valuable consideration, made by a debtor who is insolvent at the time of the conveyance.

O.C.G.A. § 18–2–22(3) (1991).

■ "When a creditor attacks a conveyance from a husband to a wife, slight circumstances may be sufficient to establish the existence of fraud. The burden is on the husband and the wife to show that the transaction as a whole was free from fraud. And it is for the jury to say whether the husband and the wife carried their burden in this regard." *Dearing v. A.R. III, Inc.*, 266 Ga. 301, 466 S.E.2d 565, 566 (1996) (construing O.C.G.A. § 18–2–22(2) and (3)); *see also Johnson v. Sheridan*, 179 Ga.App. 331, 346 S.E.2d 109, 110 (1986).

■ Under O.C.G.A. § 18–2–22(3), Plaintiff must prove (1) the voluntariness of the deed or conveyance, (2) lack of a valuable consideration, and (3) insolvency of the debtor. *Dearing v. A.R. III, Inc.*, 466 S.E.2d at 566.

The Court will first consider whether Debtor was insolvent at the time of the transfers. In *Goodman v. Lewis*,[8] the Supreme Court of Georgia stated:

> The test for determining whether a debtor is insolvent, within the meaning of [§ 18–2–22(3) ], is whether the value of his remaining property is sufficient to pay in full all of his debts. *Cohen v. Parish*, 100 Ga. 335, 28 S.E. 122 (1897). The value of the debtor's remaining property must be determined as of the date the conveyance sought to be set aside was made. *Ayers v. Harrell*, 111 Ga. 864(2), 36 S.E. 946 (1900).

277 S.E.2d at 909–10, n. 1; *see also Chambers v. Citizens & Southern National Bank*, 242 Ga. 498, 249 S.E.2d 214, 217 (1978).

■ The evidence presented shows that, between January of 1990 and May of 1992, Debtor published five financial statements which valued his assets at about $1,000,000 and his liabilities at about $225,000. In March of 1992, Debtor transferred to Defendant either a one-half or full interest in his real property, personal property, and business interests. Debtor transferred to Defendant all his interest in the marital residence,[9]

---

**6.** 11 U.S.C.A. § 544(b) (West 1993).

**7.** O.C.G.A. § 18–2–22(3) (1991).

**8.** 247 Ga. 605, 277 S.E.2d 908 (1981).

**9.** Debtor's financial statements dated May 15, 1991, and May 14, 1992, state that title to the marital residence had been held solely by Debtor.

which Debtor valued at $385,000.[10] Debtor's financial obligations were not reduced by the transfers. Debtor had additional financial obligations from his investments in the Gabby's restaurants, which were not fully disclosed on Debtor's financial statements.

The Court is persuaded from the evidence presented that the value of Debtor's remaining assets, after the transfers to Defendant, were not sufficient to pay in full all of his debts. The Court is persuaded that Debtor was insolvent as that term is used in O.C.G.A. § 18–2–22(3).

The Court now turns to consider whether the transfers were voluntary and without valuable consideration.

In *Stokes v. McRae*,[11] the Supreme Court of Georgia stated:

> [A] voluntary conveyance or deed is one without any valuable consideration. *McDonald v. Taylor*, 200 Ga. 445, 449, 37 S.E.2d 336 (1946). A valuable consideration is founded on money, or something convertible into money, or having a value in money. *Hobbs v. Clark*, 221 Ga. 558, 146 S.E.2d 271 (1965).

278 S.E.2d at 395.

A deed without consideration, other than love and affection, is a voluntary conveyance. *Brown v. Citizens & Southern National Bank*, 253 Ga. 119, 317 S.E.2d 180, 183 (1984).

In *Brown v. Citizens & Southern National Bank*,[12] the Supreme Court of Georgia stated:

> The cases show that the word "voluntary" is not used in its ordinary sense, meaning "free choice" as opposed to "compelled". In fact, the word "voluntary" is used to mean "without valuable consideration". In *Bussell v. Glenn*, 197 Ga. 816, 818, 30 S.E.2d 617 (1944), it was held that a deed from a father to his daughters without consideration other than love and affection was a voluntary conveyance. In *Stokes v. McRae*, 247 Ga. 658, 659, 278

S.E.2d 393 (1981), the court stated: "We have held, as the subsection indicates, that a voluntary deed or conveyance is one without any valuable consideration."

317 S.E.2d at 183.

Simply stated, under O.C.G.A. § 18–2–22(3), the terms "voluntary" and "not for a valuable consideration" are synonymous. Plaintiff, to satisfy these requirements, must show that the transfers were made "without any valuable consideration."

Section 13–3–41 of the Georgia Code provides:

> **13–3–41. Types of consideration.**
>
> Considerations are distinguished into "good" and "valuable." A good consideration is such as is founded on natural duty and affection or on a strong moral obligation. A valuable consideration is founded on money or something convertible into money or having a value in money, *except marriage, which is a valuable consideration.*

O.C.G.A. § 13–3–41 (1982) (emphasis added).

In *Mercantile National Bank v. Aldridge*,[13] the creditor sought to set aside as fraudulent a deed from the husband to the wife. The Supreme Court of Georgia stated:

> Was the deed voluntary? The consideration in the deed recited $10 and other valuable consideration. "The consideration of a deed may always be inquired into when the principles of justice require it." Code § 29–101 [now § 44–5–30]. Both Aldridge and his wife testified that the consideration of the deed was love and affection and that, because of his health, it was made for estate planning purposes. "Whether a deed which expresses as a consideration love and affection and a small sum of money is a voluntary conveyance depends upon the intention of the parties; and this intention is to be ascertained by an inquiry into all the facts and circumstances at the time of its execution, which will throw light upon the question as

---

10. Debtor's financial statements valued the residence at $165,000; $335,000; $385,000; $385,000; and $385,000.

11. 247 Ga. 658, 278 S.E.2d 393 (1981).

12. 253 Ga. 119, 317 S.E.2d 180 (1984).

13. 233 Ga. 318, 210 S.E.2d 791 (1974).

to whether the deed was executed as the consummation of a sale or as the evidence of a gift." *Martin v. White,* 115 Ga. 866(4), 42 S.E. 279.

210 S.E.2d at 794.

In *Prewit v. Wilson,*[14] Mr. Prewit offered to convey certain property to Miss Prewit if she would marry him. Miss Prewit accepted the offer. The deed stated that marriage was the only consideration. Miss Prewit did not know that Mr. Prewit was insolvent. Some two and one-half years later, Mr. Prewit was adjudged to be a bankrupt. The trustee sought to set aside the deed on the ground that it was executed by Mr. Prewit to defraud his creditors. The United States Supreme Court, however, held that the deed was not fraudulent. The Court stated:

> When a deed is executed for a valuable and adequate consideration, without knowledge by the grantee of any fraudulent intent of the grantor, it will be upheld, however fraudulent his purpose. To vitiate the transfer in such case, the grantee also must be chargeable with knowledge of the intention of the grantor.

> Now, marriage is not only a valuable consideration, but, as Coke says, there is no other consideration so [much] respected in the law. Bishop justly observes, that "Marriage is attended and followed by pecuniary consequences; by happiness or misery to the parties; by life to unborn children; by unquiet or repose to the State; by what money ordinarily buys and by what no money can buy, to an extent which cannot be estimated or expressed, except by the word 'infinite.' To say, therefore, that it is to be regarded, where it is the inducement to any contract, as a valuable consideration, is to utter truth, yet only a part of the truth." And, also, that "Marriage is to be ranked among the valuable considerations, yet it is distinguishable from most of these in not being reducible to a value which can be expressed in dollars and cents, while still it is in general terms of the very highest value." Law of Married Women, sects. 775, 776. Such is the purport and language running through

all the decisions, both in England and in this country, with reference to marriage as a consideration for an antenuptial settlement. *Barrow v. Barrow,* 2 Dick. 504; *Nairn v. Prowse,* 6 Ves.Jr. 752; *Compion v. Cotton,* 17 id. 264; *Sterry v. Arden,* 1 Johns. (N.Y.) Ch. 261; *Herring v. Wickham,* 29 Gratt ([70] Va.) 628.

103 U.S. at 24.

In *Holsomback v. Caldwell,*[15] the wife and husband were separated because of the husband's acts of cruelty. The wife agreed to resume marital relations and to abandon her plans for divorce in return for the husband's promise to prepare a Will in favor of the wife and to deed the marital residence to the wife. The mutual agreements were oral. The wife carried out her part of the agreement. The husband failed to make a Will or deed as promised. The wife and husband were killed in an automobile accident. The wife's estate sought specific performance of the parol contract from the husband's estate.

The Supreme Court of Georgia stated:

Hence, the question which squarely confronts us is: did the allegations of the petition show sufficient consideration on the wife's part to support the contract in question so that, subsequently, equity might require the husband's promises to be specifically performed?

It is a general rule of law that a promise to perform, or the performance of an act which a party is legally bound to perform will not constitute fresh consideration for the performance of another. In other words, such promise or performance will not [furnish] the consideration prerequisite to a valid and binding contract....

Further, where an agreement to resume marital relations is made by one spouse who has deserted the other spouse with no justification, the agreement lacks consideration....

However, if the husband has forfeited the right to his wife's common-law duties and consortium by cruel treatment or any ground sufficient to entitle her to a divorce or to be just cause for her separation from

---

**14.** 103 U.S. 22, 26 L.Ed. 360 (1880).

**15.** 218 Ga. 393, 128 S.E.2d 47 (1962).

him, then her agreement to condone his acts and resume cohabitation would furnish such consideration as would support an agreement by which the one spouse promised to convey land or other property to the other. The rationale of this rule is twofold: (1) that the dismissal of a meritorious action or a forbearance to sue is in, and of, itself a valid consideration; (2) that, after a separation resulting from wrongful acts by the husband to his wife, the husband is no longer entitled to his wife's services; hence, her consent to a resumption of the marital relations is valuable consideration. This is the general rule adhered to in the majority of jurisdictions.

Our own courts have favored the furtherance of compromise agreements and the settlement of family disputes. *Smith v. Smith*, 36 Ga. 184, 191–193. "An agreement to settle a family controversy will not be considered voluntary and without consideration, but will be enforced in equity as a fair family arrangement independent of its being a compromise of doubtful rights. * * * To render valid such compromise agreements it is not essential that the matter should be in real doubt; but it is sufficient if the parties should consider it so far doubtful as to make it the subject of compromise." Of course, there is the further provision that the party setting up the settlement contract "believed in the claims or contentions which she asserted, or made such claims or contentions in good faith." *Jones v. Robinson*, 172 Ga. 746, 757, 758, 158 S.E. 752, and cases cited.

Moreover, this court has followed the above stated majority rule, as is aptly expressed in *Young v. Young*, 150 Ga. 515, 519, 104 S.E. 149, 151: "The settlement of the family dispute and the agreement of the wife, then living separately from the husband, to return to his home, followed by the return of the wife and the resumption of marital duties * * * furnish a sufficient consideration for the deed." *McQueen v. Fletcher*, 77 Ga. 444; *Lemon v. Lemon*, 141 Ga. 448, 81 S.E. 118, *Levine*

*v. Levine*, 204 Ga. 313, 317(2), 49 S.E.2d 814, 4 A.L.R.2d 1205.

128 S.E.2d at 49–50.

In *Schichtel v. Schichtel*,[16] the Arkansas Court of Appeals stated:

> The law encourages the resumption of marital relations. Since the purpose of a reconciliation agreement is to restore marital relations, it harmonizes with public policy and will be upheld. *Hanner v. Hanner*, 95 Ariz. 191, 388 P.2d 239 (1964); see also, Lindsey, *Separation Agreements and Ante–Nuptial Contracts*, s 71, and cases cited in 24 Am.Jur.2d, *Divorce and Separation*, s 17. We adopt the following rule announced by the Maryland Court of Appeals in *Young v. Cockman*, 182 Md. 246, 34 A.2d 428 (1943):
>
> > We hold that a contract between husband and wife, made when they are separated for just cause, whereby the husband agrees to pay his wife a specified sum if she will resume marital relations, rests upon a valuable consideration and is enforceable.

621 S.W.2d at 506.

*See also Gilley v. Gilley*, 778 S.W.2d 862 (Tenn.App.1989); *Rodgers v. Rodgers*, 229 N.Y. 255, 128 N.E. 117 (1920).

■ "A marital settlement, whereby a spouse transferee releases marital rights, is actual consideration. *See Marine Midland Bank–New York v. Batson*, 70 Misc.2d 8, 332 N.Y.S.2d 714 (1972); *Smith v. Denaburg*, 283 Ala. 509, 218 So.2d 838 (1969)." *Federal Deposit Insurance Corp. v. United States*, 654 F.Supp. 794 (N.D.Ga.1986).

In *McClain v. McClain*,[17] the wife filed a complaint seeking a divorce. The husband and wife subsequently entered into a reconciliation agreement. The wife agreed to dismiss the divorce action and resume the marital relationship. The husband agreed to transfer certain property to the wife. The agreement provided that the wife would hereafter be barred from bringing an action for alimony, it being the intent of the husband and wife that the transfers of property

---

**16.** 3 Ark.App. 36, 621 S.W.2d 504 (1981).

**17.** 237 Ga. 80, 227 S.E.2d 5 (1976).

would be in lieu of all past, present, and future claims the wife may have against the husband.

The wife later filed an action for divorce. The wife argued that she was not barred from future alimony because the reconciliation agreement was rendered void by the parties' subsequent cohabitation.

The Supreme Court of Georgia disagreed and stated:

The agreement in the present case was entered into to effect a reconciliation of the marriage. It gave the wife that to which she would have been entitled as alimony had she gone through with the divorce.

In *Evans v. Hartley,* 57 Ga.App. 598, 601, 196 S.E. 273, 275 (1938), it was held: "It is the public policy of this State to maintain the family relation and to permit the settlement of matrimonial differences for that purpose. Code §§ 53–107, 53–108; [cits.]." In *Young v. Young,* 150 Ga. 515(3), 104 S.E. 149 (1920), this court held: "A deed between husband and wife, not made as a provision for alimony while living separate and apart from the husband, but made in consideration of the wife's agreement to return to the husband's home and to resume her marital relations, is not rendered void by the subsequent cohabitation of the husband and wife, under the provisions of section 2990 of the Civil Code of 1910 [now Code § 30–217]." Also, this court held in *Brown v. Farkas,* 195 Ga. 653(2), 25 S.E.2d 411 (1943): "Where such a contract was entered into for the purpose of settling the question of alimony, its meaning and effect should be determined according to the usual rules for the construction of contracts, the cardinal rule being to ascertain the intention of the parties."

It is manifest from the wording of the agreement in this case that the intention of the parties is that "this agreement and the gifts and transfers of property from Defendant to Plaintiff shall be in lieu of all past, present, or future claims against Defen-

dant or his estate by Plaintiff," for alimony.

The trial court did not err in holding the present contract valid and that the appellant was barred from further alimony in this action.

227 S.E.2d at 6–7.

■ Turning to the case at bar, the facts clearly show that Defendant had sufficient grounds to obtain a divorce from Debtor. *See* O.C.G.A. § 19–5–3 (1991) (grounds for divorce include adultery). The Court is persuaded that Defendant and Debtor reasonably believed that Defendant would receive a substantial property settlement and alimony award.

The three post-nuptial agreements provide that the agreements shall be made a part of a court decree should either Defendant or Debtor seek a legal separation or divorce. The agreements dated March 23, and 30, 1996, further provide that both Defendant and Debtor waive any claim for alimony or property division except as provided in the agreements.[18]

■ The Court is persuaded that one purpose of the agreements was to settle alimony and property division issues should either Defendant or Debtor seek a divorce. The Court is persuaded that the settlement of a bona fide family controversy and waiver of further claims for alimony or property division is a valuable consideration under O.C.G.A. § 18–2–22(3).

The Court further notes that Defendant was willing to reconcile and cohabit when she and Debtor signed the October 4, 1991, Agreement. Defendant had sufficient grounds to seek a divorce and would have received a substantial alimony award and property settlement. Defendant agreed to forbear because Debtor agreed to end his extramarital affair and transfer certain property to Defendant. The evidence shows that Defendant's desire to preserve the marriage was genuine. The evidence shows that Defendant and Debtor have reconciled and are living together as husband and wife.

18. *See* October 4, 1991, Agreement, Section 7; March 23, 1992, Agreement, Sections 5 and 9; March 30, 1992, Agreement, Sections 5 and 9.

The Court is persuaded that Defendant's forbearance to sue for divorce and the attempt to work through the marital problems was a valuable consideration.

Debtor executed four deeds in favor of Defendant. The deeds carried out certain provisions of the post-nuptial agreements. The Court is persuaded that the deeds were executed for valuable consideration.

The Court now turns to consider Count VIII of Plaintiff's amended complaint. In this count, Plaintiff seeks to recover the $64,596.27 received by The Money Store in satisfaction of the lien on the marital residence. Until a few days prior to the trial of this adversary proceeding, all parties believed that Debtor had made the payment to The Money Store. The evidence presented at trial, however, shows that Defendant issued the check in favor of The Money Store. The Court allowed Defendant and The Money Store to present this evidence and amend their answers to Plaintiff's amended complaint after Plaintiff failed to show that he would be prejudiced by presentation of this evidence.

■ The evidence, therefore, shows that The Money Store was not the initial transferee of the $64,596.27 as that term is used in 11 U.S.C.A. § 550(a)(1). The Court, therefore, is persuaded that Plaintiff cannot recover from The Money Store.

Based upon the evidence presented at trial, Plaintiff amends Count VIII of his complaint and seeks to recover the $128,500 [19] received by Defendant as either a preferential transfer or fraudulent conveyance. Plaintiff relies upon sections 547(b),[20] 548(a),[21] and 550(a) [22] of the Bankruptcy Code.[23]

Section 547(b) provides:

§ 547. Preferences

. . . .

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C.A. § 547(b) (West 1993).

Section 548(a)(2) and (d)(2)(A) provides, in part:

§ 548. Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

19. Debtor sold his dental practice in January of 1994. Debtor gave Defendant the sale proceeds check in the amount of $128,500.

20. 11 U.S.C.A. § 547(b) (West 1993).

21. 11 U.S.C.A. § 548(a) (West 1993).

22. 11 U.S.C.A. § 550(a) (West 1993).

23. Plaintiff, in his brief, argues that the transfer was fraudulent solely under section 548(a)(2). Plaintiff does not argue section 548(a)(1) (actual intent to hinder, delay, or defraud creditors).

**(B)(i)** was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

. . . .

. . . .

**(d)** . . . .

(2) In this section—

(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor;

11 U.S.C.A. § 548(a)(2), (d)(2)(A) (West 1993).

Section 550(a) provides:

**§ 550. Liability of transferee of avoided transfer**

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C.A. § 550(a) (West 1993).

■ Plaintiff has the burden of proving all facts necessary to prove the avoidability of a transfer under sections 547(b) and 548(a). 11 U.S.C.A. § 547(g) (West 1993); *Harris v. Huff (In re Huff)*, 160 B.R. 256, 260 (Bankr.M.D.Ga.1993).

■ "It has long been established that '[w]hether fair consideration has been given for a transfer is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." ' The burden of proving lack of 'reasonably equivalent val-

ue' under 11 U.S.C.A. § 548(a)(2)(A) rests on the trustee challenging the transfer." *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990).

The evidence presented at trial shows that Debtor was insolvent in March of 1992. The evidence presented shows that Debtor's financial condition did not improve after 1992. Debtor sold his dental practice in January of 1994. The Court is persuaded that Debtor was insolvent when he gave the sale proceeds check to Defendant some three and one-half months prior to Debtor's bankruptcy filing.[24]

Defendant argues that her right to receive one-half of the sale proceeds of Debtor's dental practice was an equitable assignment under the terms of the March 30, 1992, Agreement. Defendant, in her brief to the Court, states:

Under the evidence in the case, it is clear that the moneys ultimately received by Defendant Galbreath had been earmarked and specifically described when the right to collect was assigned to her in the Agreement. Since it was an equitable assignment at the time the Agreement was made, then the transfer of the funds when collected would not be a transfer to an insider subject to being recovered. See also *In Re: Kleckner*, 93 Bankr. 143 (N.D.Ill., 1988) wherein the court recognizes the equitable assignment theory concerning attorney fees to be valid.

Defendant's Brief at 5, filed Nov. 15, 1996.

Defendant relies upon *Bank of Cave Spring v. Gold Kist, Inc.*,[25] in which the Georgia Court of Appeals stated:

An assignment, unlike a lien, is not merely a charge upon the subject property but is an absolute, unconditional, and completed transfer of all right, title, and interest in the property that is the subject of the assignment (whether in the property as a whole or a specified estate in or portion of the property), with the concomitant total relinquishment of any control over the

---

**24.** Plaintiff, in his brief, asserts that the transfer occurred on January 7, 1994. The evidence presented shows that the transfer occurred sometime in January prior to January 24. Debtor filed for bankruptcy relief on April 29, 1994.

**25.** 173 Ga.App. 679, 327 S.E.2d 800 (1985).

property. *Reinstatement of Contracts, 2nd,* defines the assignment of a right, at § 317(1), as a "manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance is extinguished in whole or in part and the assignee acquires a right to such performance." See *Johnson v. Brewer,* 134 Ga. 828, 68 S.E. 590 (1910); *King v. Gilbert,* 445 F.Supp. 479 (N.D.Ga., 1977). An assignment is a contract and, in order to be valid, must possess the same requisites (parties, subject matter, mutual assent, consideration) as any other contract. 4A *Words & Phrases* 109.

Assignments may be either legal or equitable. "[T]o effect a legal assignment, there must be evidence of intent to assign or transfer the whole or part of a specific thing, debt, or chose in action, and the subject matter should be sufficiently described to make it capable of being identified." 6 *Am.Jur.2d* 185. An equitable assignment likewise makes an absolute appropriation of, or transfer or a present interest in, a fund or chose in action to the assignee, but in a manner that for one reason or another does not amount to a legal assignment. "In equity ... [t]he assignment of contingent interest, expectancies, and things not *in esse,* but resting in mere possibility, ... takes effect when the thing assigned comes into existence, ... [provided that the assignment] was fairly made, is supported by a sufficient consideration, and is not contrary to public policy." Id. at 193; accord *Walton v. Horkan,* 112 Ga. 814, 38 S.E. 105 (1901).

The assignment of an existing obligation or contractual relationship, in contrast, is legal in nature rather than equitable.

327 S.E.2d at 802.

The court continued, stating:

In concluding that the bank's assignment is equitable rather than legal in nature, the trial court quotes from the Supreme Court's decision in *Jones v. Glover,* 93 Ga. 484, 487, 21 S.E. 50 (1893): "[i]n order to infer an equitable assignment, such facts or circumstances must ... not only raise an equity between the assignor and assignee, but show that the parties contemplated an immediate change of ownership with respect to the particular fund in question, not a change of ownership when the fund should be collected or realized."

327 S.E.2d at 804.

The October 4, 1991, Agreement provides in Section 2(d) as follows:

(d) Husband in the event of a divorce between these parties agrees that he will put his dental practice on the market for sale and that Wife will receive one-half of the proceeds and that said sale will be a bona fide sale for a reasonable and fair market value.

The March 30, 1992, Agreement provides in Section 2(d) as follows:

d. (dental practice)

Husband has agreed and hereby reaffirms such agreement, that he will, in the event he puts his dental practice on the market for sale, make a bona fide effort to sell said practice at [its] fair market value to a "bona fide purchaser for value." Upon such sale, Husband agrees that Wife shall receive ½ of the selling price of said dental practice. The parties stipulate in this document that they may in the alternative, by mutual agreement, make some other arrangement if agreeable to both parties that would permit Husband to pay to Wife a sum equivalent to the value of a ½ undivided interest in said dental practice.

 These sections, when read together, provide that Debtor, in the event of a divorce, would be obligated to sell his dental practice. Debtor was obligated to sell his dental practice only "in the event of a divorce." Defendant and Debtor did not obtain a divorce. Debtor sold his practice because he was disabled and unable to practice dentistry. Defendant and Debtor had reconciled and were living together as husband and wife at the time of the sale.

The Court is not persuaded that Debtor was obligated to give Defendant the sale proceeds from Debtor's dental practice. Debtor was obligated to sell his dental practice only "in the event of a divorce." The Court is persuaded that Debtor did not make an equitable assignment of his dental practice to Defendant.

From the evidence presented, the Court is persuaded that Plaintiff has not carried his burden to show that the $128,500 was a preferential transfer. Defendant was an "insider" of Debtor.[26] Thus, the one-year reach back period applies. 11 U.S.C.A. § 547(b)(4)(B) (West 1993). The Court is not persuaded that Defendant, in January of 1994, was a creditor with an antecedent debt. Defendant and Debtor had reconciled and were living together as husband and wife. The $128,500 given by Debtor to Defendant in January of 1994 was not in payment of an antecedent debt, but was more in the nature of a gift.

The Court now turns to Plaintiff's argument that Defendant's receipt of the sale proceeds check was a fraudulent conveyance under section 548(a)(2).

In *General Electric Credit Corp. of Tennessee v. Murphy (In re Rodriguez),*[27] the Eleventh Circuit Court of Appeals stated:

> The purpose of voiding transfers unsupported by "reasonably equivalent value" is to protect creditors against the depletion of a bankrupt's estate. 11 U.S.C. § 548(a)(2); *Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 829–30 (5th Cir. 1959), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960). Therefore, this provision does not authorize voiding a transfer which "confers an economic benefit upon the debtor," either directly or indirectly. *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991 (2nd Cir.1981). In such a situation, "the debtor's net worth has been preserved," and the interests of the creditors will not have been injured by the transfer. *Id.*

895 F.2d at 727.

In *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),*[28] the Chapter 11 trustee brought a fraudulent conveyance action against a bank. The Eleventh Circuit Court of Appeals assumed, without deciding, that the transfer was a fraudulent conveyance. The circuit court then determined that the trustee could not recover from the bank

because the bank was merely a conduit for the funds at issue. The circuit court stated:

> In [*In re Chase & Sanborn Corp.,* 813 F.2d 1177 (11th Cir.1987)], our circuit applied the control test, previously used by other circuits in the context of avoidable preferences, *see* 11 U.S.C. § 547 (1982 & Supp. IV 1986), to determine whether a debtor had possessed property allegedly recoverable under section 548. The test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must "look beyond the particular transfers in question to the entire circumstance of the transactions." *In re Chase & Sanborn Corp.,* 813 F.2d at 1181–82.

> The control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law. *See Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966) (noting that "equitable principles govern the exercise of bankruptcy jurisdiction"); *In re Chase & Sanborn Corp.,* 835 F.2d 1341, 1349 (11th Cir.1988); [*In re Colombian Coffee Co.*] *Coffee II,* 75 B.R. [177] at 179–80. We feel that the general approach outlined in *In re Chase & Sanborn Corp.* applies regardless of whether a court is attempting to determine whether a debtor controlled the transferred funds it transferred to a defendant *or* a defendant gained control over the funds transferred to it.

> We are not creating new law, or even expanding on the existing doctrine. Bankruptcy courts considering the question of whether a defendant is an initial transferee have traditionally evaluated that defendant's status in light of the entire transaction. And, in the past, courts have refused to allow trustees to recover property from defendants who simply held the property

---

**26.** 11 U.S.C.A. § 101(31)(A) (West 1993) (insider includes a relative of the debtor).

**27.** 895 F.2d 725 (11th Cir.1990).

**28.** 848 F.2d 1196 (11th Cir.1988).

as agents or conduits for one of the real parties to the transaction. Had these courts employed an overly literal interpretation of section 548, they could have allowed the trustees to recover the funds from the defendants. Instead, they determined that, although technically the defendants had received the funds from the debtors and could be termed "initial transferees," the defendants had never actually *controlled* the funds and therefore it would be inequitable to allow recovery against them.

848 F.2d at 1199–1200.

 Turning to the case at bar, Defendant received from Debtor the sale proceeds from Debtor's dental practice. Defendant testified that she used $112,496.27 of the sale proceeds to pay obligations owed by Debtor. These payments conferred a direct economic benefit upon Debtor by reducing his obligations. The Court is not persuaded that Plaintiff can recover these funds from Defendant under section 548(a) of the Bankruptcy Code.

The Court notes that the amount of the sale proceeds was $128,500. Defendant has not shown that the remaining $16,003.73 was used to confer a direct or indirect economic benefit upon Debtor. The Court is persuaded that Debtor did not receive a reasonably equivalent value for those funds and that Plaintiff may recover that amount ($16,-003.73) from Defendant. *See Walker v. Treadwell (In re Treadwell),* 699 F.2d 1050 (11th Cir.1983) (love and affection is not reasonably equivalent value).

An order in accordance with this memorandum opinion will be entered this date.