25 F.3d 728
 62 USLW 2771, Bankr. L. Rep. P 75,868
 In re GRAND CHEVROLET, INC., and related entities,
including: Grand Motors, Inc.; Grand Wilshire
Finance Corp., Grand Rizal Finance
Corp., Grand Wilshire Capital,
Inc., Debtors.
Irving SULMEYER, Chapter 11 Trustee, Plaintiff-Appellant,
v.
Pacific SUZUKI, Defendant-Appellee.
 No. 92-56461.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 7, 1994.
Decided May 6, 1994.
As Amended on Denial of Rehearing June 24, 1994.
 
 Steven R. Wainess, Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, CA, for plaintiff-appellee.
 Pamela Webster, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before: FARRIS, RYMER and KLEINFELD, Circuit Judges.
 Opinion by Judge FARRIS
 FARRIS, Circuit Judge:
 
 
 1
 Trustee Irving Sulmeyer appeals the granting of summary judgment to Pacific Suzuki. The district court held that transfers from Grand Motors, Inc. to Pacific were not voidable as preferences because they fell within the ordinary course of business exception, 11 U.S.C. Sec. 547(c)(2), and the contemporaneous exchange exception, 11 U.S.C. Sec. 547(c)(1).
 
 
 2
 The trustee originally filed his complaint in the bankruptcy court. The bankruptcy court had jurisdiction pursuant to 28 U.S.C. Secs. 157(b) and 1334(a). The district court, which withdrew the reference to the bankruptcy court, had jurisdiction pursuant to 28 U.S.C. Sec. 157(d). We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 I. BACKGROUND
 
 3
 The debtor, Grand Motors, was in the business of buying new cars from dealers such as Pacific Suzuki and reselling them to consumers as used. The debtor filed a voluntary bankruptcy petition on August 8, 1988.[1] The trustee seeks to avoid three transfers from Grand Motors to Pacific Suzuki as preferences under Sec. 547(b) of the Bankruptcy Code, 11 U.S.C. Sec. 547(b).
 
 
 4
 The transfers all involved "automobile purchase drafts." Automobile purchase drafts are similar to checks and are commonly used among dealers in the automobile industry. In exchange for delivery of a vehicle, the buyer gives the seller a purchase draft. The seller then endorses the purchase draft and deposits it with his bank. The seller's bank presents the purchase draft to the buyer's bank, which credits the seller's account or issues a check to the seller.
 
 
 5
 Purchase drafts include sight drafts and time drafts. A sight draft, like a check, is payable on demand. When the seller's bank presents a sight draft to the buyer's bank, it is payable immediately. In contrast, a time draft specifies the period of hours or days in which the buyer's bank has to pay the amount owed.
 
 
 6
 The first transfer involved a "72 hour" time draft in the amount of $9,066.60. Vehicle 1 was delivered to the debtor on June 16, 1988 in exchange for the purchase draft. After presentment, the debtor's bank, Manilabank, took approximately three weeks to honor the purchase draft.
 
 
 7
 Vehicles 2 and 3 were delivered on April 29, 1988 in exchange for "30 day" time drafts in the amount of $8,208.60 each. Those purchase drafts were never presented to the debtor's bank for payment. Instead, around May 31, 1988, the debtor paid for the cars directly with a check. In exchange for the check, the debtor received the title documents to the vehicles and the unredeemed purchase drafts.
 
 
 8
 The purchase agreements for each vehicle provided that payment was due one day after delivery and that Pacific Suzuki would retain all title documents pertaining to each vehicle until payment was received. The purchase agreements are in apparent conflict with the time drafts issued by the debtor, since under the terms of the time drafts, the debtor's bank, Manilabank, had 72 hours (Vehicle 1) and 30 days (Vehicles 2 and 3) to pay Pacific Suzuki--well in excess of the 24 hour period called for in the purchase agreement.
 
 
 9
 The district court held (1) that the trustee could not avoid the debtor's payment on account of Vehicle 1 because the ordinary course exception, Sec. 547(c)(2), applied and (2) that the check payments made on account of Vehicles 2 and 3 were not avoidable as preferences by virtue of the contemporaneous exchange exception, Sec. 547(c)(1). We review de novo. In re Food Catering & Housing, Inc., 971 F.2d 396, 397 (9th Cir.1992).
 
 II. Matter of Vance
 
 10
 The trustee, relying on Matter of Vance, 721 F.2d 259 (9th Cir.1983), argues that the district court should not have applied the ordinary course and contemporaneous exchange exceptions. He contends that the purchase money security interest exception, Sec. 547(c)(3),[2] is the only preference defense that may be invoked whenever a purchase money security interest is involved in a transaction.
 
 
 11
 The trustee failed to raise this argument before the district court. An appellate court will not generally consider arguments not raised before the district court unless there are "exceptional circumstances." In re Professional Investment Properties, 955 F.2d 623, 625 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 638, 121 L.Ed.2d 569 (1992). One "exceptional circumstance" we have identified is when the "issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." Id. The applicability of Vance is purely a matter of law and does not depend on the factual record developed at the trial level. We therefore address the trustee's argument.
 
 
 12
 By its terms, Sec. 547(c)(3) applies to a transfer "that creates a security interest in property acquired by the debtor...." 11 U.S.C. Sec. 547(c)(3) (emphasis added). In Vance, the trustee was seeking to avoid the creditor's perfection of a security interest as a preference. The perfection of a security interest constitutes a "transfer" of a security interest under the Bankruptcy Code. The creditor in Vance was unable to invoke a Sec. 547(c)(3) defense because it had failed to perfect its security interest within ten days. See 11 U.S.C. Sec. 547(c)(3)(B). Instead, the creditor argued that the contemporaneous exchange exception, Sec. 547(c)(1), applied because the perfection of its security interest was "substantially contemporaneous" with the underlying transaction (even though the perfection occurred more than ten days later). We rejected the argument and held that to allow a creditor to invoke the contemporaneous exchange exception for transfers of security interests would render the 10 day perfection period in Sec. 547(c)(3)(B) superfluous. Vance, 721 F.2d at 261.
 
 
 13
 Here, the trustee is attempting to avoid payments made on a secured, but unperfected, loan. A payment on a loan (whether secured or unsecured) is very different from a transfer of a security interest. Because the trustee is not seeking to avoid a transfer of a security interest, our holding in Vance does not apply. Pacific Suzuki is therefore not precluded from raising the contemporaneous exchange exception or the ordinary course exception.
 
 III. THE ORDINARY COURSE EXCEPTION
 
 14
 The district court held that the transfer on account of Vehicle 1 to Pacific fell within the ordinary course exception, Sec. 547(c)(2),[3] and was therefore not voidable as a preference.
 
 
 15
 To qualify for the ordinary course exception, a creditor must prove by a preponderance of the evidence that "1) the debt and its payment are ordinary in relation to past practices between the debtor and the creditor; and 2) the payment was ordinary in relation to prevailing business standards." In re Food Catering & Housing, 971 F.2d at 398. The trustee concedes that the debt to Pacific Suzuki was incurred in the ordinary course of business, but argues that the payment on account of Vehicle 1 was neither ordinary in relation to past practices nor in relation to prevailing business standards.
 
 A. Relation to Past Practices
 
 16
 Among the factors courts consider in determining whether transfers are ordinary in relation to past practices are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and, 4) whether the creditor took advantage of the debtor's deteriorating financial condition. See In re Richardson, 94 B.R. 56, 60 (Bankr.E.D.Pa.1988).
 
 
 17
 It is undisputed that Pacific Suzuki and the debtor engaged in similar transactions for approximately six years. Further, the trustee does not dispute that the amount paid for the vehicles was not excessive and that the vehicles were often obtained with automobile purchase drafts. The trustee argues, however, that as a matter of law, the payment on account of Vehicle 1 was not "ordinary" because it was late--i.e. Pacific Suzuki received payment after the one day term called for in the purchase agreements and after the time period stated in the purchase drafts.
 
 
 18
 We have held that "[d]elay is particularly relevant in taking a payment outside the ordinary course of business exception." In re Food Catering, 971 F.2d at 398. We have not, however, adopted a per se rule that late payments can never be ordinary. Other circuits have held that late payments can fall within the ordinary course of business exception if the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made late. See Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir.1991); In re Yurika Foods Corp., 888 F.2d 42, 44 (6th Cir.1989). We now join those circuits.
 
 
 19
 Pacific Suzuki introduced uncontroverted evidence that from January 1988 until early April 1988 (prior to the 90 day preference period), nine transactions between Pacific Suzuki and the debtor involved "72 hour" time drafts. None of the drafts were honored within 72 hours. On average, it took three weeks to honor the drafts. Thus, there was nothing unusual about Pacific regularly receiving late payments. There is also no evidence that Pacific took advantage of the debtor's deteriorating financial condition.
 
 
 20
 The purchase draft for Vehicle 1 was honored within three weeks. The transfer was ordinary in relation to past practices between the debtor and Pacific.
 
 B. Prevailing Business Standards
 
 21
 The trustee also argues that the payments to Pacific Suzuki were not ordinary in relation to prevailing business standards. The district court found that Pacific Suzuki introduced "largely uncontested evidence" from experts in the automobile finance industry that banks regularly take from two weeks to one month to honor a purchase draft, regardless of whether it is a sight draft, a "72 hour" draft or any other kind of draft. The trustee has pointed to no evidence contradicting the district court's finding. Thus, the time it took for the "72 hour" draft to be honored by Manilabank was not unusual in relation to "prevailing business standards."
 
 IV. THE CONTEMPORANEOUS EXCHANGE EXCEPTION
 
 22
 The district court held that the contemporaneous exchange exception, Sec. 547(c)(1),[4] applied to the payments received by Pacific for Vehicles 2 and 3.[5]
 
 
 23
 The checks given to Pacific Suzuki were clearly not exchanged contemporaneously with the vehicles: the vehicles were delivered over one month before Pacific Suzuki received the debtor's checks. In exchange for the checks, Pacific Suzuki released its unperfected security interests in Vehicles 2 and 3 and the debtor received the title documents to those vehicles. The district court held that the contemporaneous exchange exception applied because the debtor received "new value" from Pacific Suzuki when "it gave Pacific Suzuki two checks in exchange for the title documents ... [of] the two vehicles it had purchased and obtained from Pacific Suzuki approximately a month earlier."
 
 
 24
 In support of its holding, the district court cited In re George Rodman, Inc., 792 F.2d 125, 127 (10th Cir.1986), which held that the release of a lien in exchange for a debtor's payment represented a contemporaneous exchange for new value. The holding in Rodman has been narrowed by the Tenth Circuit in In re Robinson Bros. Drilling, 877 F.2d 32 (10th Cir.1989), and we have adopted our own approach to determining the value of a released lien under Sec. 547(c)(1). In In re Nucorp Energy, 902 F.2d 729, 733 (9th Cir.1990), we held that "a court must measure the value given to the creditor and the new value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange." See also In re Spada, 903 F.2d 971, 977 (3d Cir.1990) (holding that party seeking shelter of Sec. 547(c)(1) must "prove the specific measure of the new value given to the debtor in the exchange"); In re Arrow Air, 940 F.2d 1463 (11th Cir.1991). Value should be measured at the time of the transfer. In re Nucorp Energy, 902 F.2d at 733; In re Robinson Bros. Drilling, 877 F.2d at 33.
 
 
 25
 The district court appears to have concluded that since Pacific's release of the security interests and title documents added some new value to the debtor's estate, the entire payment to Pacific from the debtor was within the scope of Sec. 547(c)(1). Under Nucorp, however, the district court should have determined how much, if any, new value the debtor obtained from the transfer.
 
 
 26
 Under Nucorp, the debtor's check payments for Vehicles 2 and 3 would qualify at least in part under Sec. 547(c)(1) if Pacific Suzuki's unperfected security interests had "value" within the meaning of that section. At the time of the transfer, the debtor's petition for bankruptcy had not been filed, and the trustee did not have the status of lien creditor under the Bankruptcy Code's strong-arm clause. See 11 U.S.C. Sec. 544(a) (conferring status of lien creditor on trustee as of date bankruptcy petition is filed). At the time of the transfer, the trustee did not have an interest in the vehicles with priority over Pacific Suzuki's unperfected security interests because the trustee had not yet attained the status of lien creditor under the Bankruptcy Code's strong-arm clause. See 11 U.S.C. Sec. 544(a) (conferring status of lien creditor on trustee as of date bankruptcy petition is filed). However, the record developed before the district court does not establish whether other creditors had superior interests. If no other creditor held a superior security interest, then the value of Pacific Suzuki's unperfected interests would equal the value of the collateral. If, however, other creditors held superior security interests, then Pacific Suzuki's release of its unperfected security interests might not have conferred any new value on the debtor's estate.
 
 
 27
 In addition to the release of the security interests, the debtor received title documents to the vehicles. Although receipt of the title documents was not necessary for title to pass,[6] the debtor needed them to resell the vehicles to consumers. Thus, there may have been "new value" attributable to having the documents of title that is apart from or different from that inhering in the security interests. We leave that to the district court to discern.
 
 
 28
 The district court was therefore correct that Pacific Suzuki conferred "new value" on the debtor's estate by releasing the title documents and security interests. The district court should now apply our holding in Nucorp and measure the extent to which "new value" was conferred on the debtor's estate at the time of the check transfers (i.e. May 31, 1988). The extent to which the transfers will be shielded by the contemporaneous exchange exception will depend on what combined value the district court attaches to the unperfected security interests and documents of title.
 
 V. CONCLUSION
 
 29
 The district court's grant of summary judgment in favor of Pacific Suzuki with respect to Vehicle 1 is AFFIRMED. The district court's grant of summary judgment in favor of Pacific Suzuki with respect to Vehicles 2 and 3 is REVERSED and REMANDED for determination of the extent to which the release of the security interests and documents of title conferred new value on the debtor's estate.
 
 
 30
 Each side shall bear its own costs.
 
 
 31
 AFFIRMED in part. REVERSED and REMANDED in part.
 
 
 
 [1]
 Other debtors in this consolidated bankruptcy case are Grand Chevrolet, Inc., Grand Wilshire Finance Corporation, Grand Rizal and Grand Wilshire Capital
 
 
 [2]
 Section 547(c)(3) provides that the trustee may not avoid a transfer
 (3) that creates a security interest in property acquired by the debtor
 (A) to the extent such security interest secures new value that was
 (i) given at or after the signing of a security agreement that contains a description of such property as collateral;
 (ii) given by or on behalf of the secured party under such agreement;
 (iii) given to enable the debtor to acquire such property; and
 (iv) in fact used by the debtor to acquire such property; and
 (B) that is perfected on or before 10 days after the debtor receives possession of such property.
 
 
 [3]
 Section 547(c)(2) provides that the trustee may not avoid a transfer to the extent that such transfer was
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 (C) made according to ordinary business terms.
 
 
 [4]
 Section 547(c)(1) provides that the trustee may not avoid a transfer to the extent that such transfer was
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange.
 
 
 [5]
 The district court held that the transfers relating to Vehicles 2 and 3 were not made in the ordinary course of business
 
 
 [6]
 The California Commercial Code (California's version of the Uniform Commercial Code) applies to the sale of motor vehicles when the vehicles are held as "inventory" by the buyer. See Cal.Com.Code Sec. 9302(3)(b). Section 1201(37)(a) of the Commercial Code provides that "the retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer ... is limited in effect to reservation of a 'security interest.' "