**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**January 23, 2006**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 16, 2006
UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-20752

In The Matter Of: RAMBA INC.
Debtor

LOWELL T. CAGE,

Appellant,

v.

WYO-BEN, INC.; GEORESOURCES, INC.; TRANS-CAPITAL,INC.;
M-I, LLC, doing business as Federal Wholesale Drilling
Mud; SCHLUMBERGER TECHNOLOGY CORP., doing business as
Dowell Schlumberger; AMCHEM, INC.; ENTERPRISE FLEET
SERVICES; DANOS & CUROLE MARINE CONTRACTORS, INC.;
MILWHITE, INC.; EXCALIBAR MINERALS, INC.

Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

This case involves a trustee's attempt to avoid transfers to creditors in a Chapter 7 bankruptcy. The district court granted summary judgment to the Appellees, holding that indirect transfers to ten creditors did not constitute voidable preferences. It reached this conclusion after holding that the transfers were in the

ordinary course of business and that the transfers were made from property in which the debtor had no interest. We AFFIRM on the grounds of the second holding and therefore do not reach the first. The district court also considered one direct transfer. It erred when it found that the transfer was in the ordinary course of business. Therefore, we AFFIRM in part and VACATE and REMAND in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 2000, Ramba, Inc. filed for Chapter 7 bankruptcy. The Trustee, Lowell Cage, filed numerous proceedings against entities who received transfers from Ramba, including actions against the Appellees. The Appellees are ten vendors who provided materials, equipment, and services to Ramba's drilling division.[1] After a request for a jury trial, the proceedings were removed to the district court and consolidated into one case.

All but one of the transfers at issue resulted from the sale of Ramba's drilling division to a subsidiary of Patterson Energy, Inc. Ramba and Patterson entered an "Asset Purchase Agreement" on September 30, 2000, two months prior to the bankruptcy filing, while Ramba was doing business as Ambar, Inc. The transaction required Ramba to sell all the assets of its drilling division, and, as part

---

[1]The Appellees are: M-I, L.L.C.; Danos & Curole Marine Contractors, Inc.; GeoResources, Inc.; Milwhite, Inc.; Excalibar Minerals, Inc.; Amchem, Inc.; Schlumberger Technology Corp.; Wyo-Ben, Inc.; Trans-Capital, Inc.; and Enterprise Fleet Services.

of the consideration, Patterson assumed some of Ramba's liabilities. Those liabilities included debts owed to the Appellees. Ramba also sold Patterson the rights to the name "Ambar." A Patterson subsidiary later began doing business as "Ambar Drilling."

Prior to the selling of the division, Ramba owed Citibank more than $25 million under a credit agreement dated August 14, 1997. Pursuant to that agreement, Ramba granted Citibank liens on all its assets, including the assets ultimately sold to Patterson. The result was that Citibank's security interests wholly encumbered Ramba's assets, exceeding their fair market value. As part of and essential to the sale to Patterson, Citibank agreed to release its security interests in the assets of the drilling division and to allow some of the purchase price to go toward paying Ramba's debts. The result of the deal was that Patterson received the assets "free and clear" of all liens and paid Citibank $15.6 million in full and final satisfaction of its liens. Patterson then paid the remainder of the consideration, approximately $10 million, to Ramba's creditors, the Appellees.

The Trustee attempts to set aside as preferential the transfers to the Appellees that resulted from the sale to Patterson and one "direct" transfer made by Ramba to Appellee GeoResources. The district court held that these transfers did not constitute voidable preferences. The decision constituted an appealable final judgment. *See Zink v. United States*, 929 F.2d 1015, 1020 (5th Cir. 1991) ("A

3

judgment is final when it terminates litigation on the merits and leaves the court with nothing to do except execute the judgment.")

## II. STANDARD OF REVIEW

This Court reviews a district court's grant of a summary judgment *de novo*, applying the same standards as the district court. *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996). The evidence should be viewed in the light most favorable to the nonmoving party, and the record should not indicate a genuine issue as to any material fact. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 486 (5th Cir. 2004). This Court reviews factual findings for clear error. *In re Mercer*, 246 F.3d 391, 402 (5th Cir. 2001).

## III. DISCUSSION

### A. Indirect Transfers to Appellees

Section 547(b) of the Bankruptcy Code establishes the six elements of any preference action. To be a preference there must be:

> (1) "a transfer of an interest of the debtor in property; "
> (2) "to or for the benefit of a creditor;"
> (3) "for or on account of an antecedent debt owed by the debtor before such a transfer was made;"
> (4) "made while the debtor was insolvent;"
> (5) "made on or within 90 days before the date of the filing of the petition" (or one year if an insider);

4

and
(6) one "that enables such creditor to receive more than such creditor would receive" if (A) the debtor filed under Chapter 7, and (B) the transfer had not been made.

11 U.S.C. § 547(b) (2000). The transfers at issue fail to meet the first element.

A debtor has an interest in property if that property would have been part of the debtor's bankruptcy estate had the transfer not occurred. *See In re Criswell*, 102 F.3d 1411, 1416 (5th Cir. 1997). A trustee cannot avoid transfers of property unless the property would have been in the estate and therefore available to the debtor's general creditors. *Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir. 2001). Essentially, a voidable preference must have depleted the estate. *Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224, 230-31 (5th Cir. 1988). A trustee bears the burden of proving that the debtor had an interest in the transferred property. *Warsco*, 258 F.3d at 564.

The Bankruptcy Code offers further explanation of what assets fall within a bankruptcy estate. Section 541 of the Code states:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). There can be no preference when a debtor transfers property in which the debtor has no equitable interest. *See In re Bean*, 252 F.3d 113, 117 (2d Cir. 2001); *In re Parham*, 72

5

B.R. 604, 605 (Bankr. M.D. Fla. 1987); *In re Central States Press*, 57 B.R. 418, 422 (Bankr. W.D. Mo. 1985) ("Even the most liberal rules permitting recovery under § 547 . . . apply only to the extent that the value of the collateral transferred exceeds the indebtedness of the debtor on the security interest.").

In *In re Maple Mortgage, Inc.*, 81 F.3d 592, 595 (5th Cir. 1996), we held that funds at issue in a preference dispute must have been available for distribution to general creditors. "[I]f funds cannot be used to pay the debtor's creditors, then they generally are not deemed an asset of the debtor's estate for preference purposes." *Id.* While *Maple Mortgage* did not specifically address whether a debtor's bankruptcy estate includes fully encumbered property, it recognized the common sense reasoning that funds must be available to pay creditors. Other courts have reached similar results, holding that a bankruptcy estate is made up of equity, as opposed to legal title alone. *See, e.g.*, *In re Mahendra*, 131 F.3d 750, 755 (8th Cir. 1997) (holding that "[a]ny portion of a debtor's property that is unencumbered by mortgage—the equity—is part of the bankrupt's estate."); *U.S. v. Rauer*, 963 F.2d 1332 (10th Cir. 1992) (same).[2]

---

[2]When a debtor holds only legal title to fully encumbered property during a Chapter 7 bankruptcy, the trustee typically abandons the property because the estate cannot benefit from its sale. For that reason, few cases exist that involve a dispute as to whether fully encumbered property can be property of an estate.

6

At the time of the drilling division sale, it is undisputed that Ramba's assets were fully encumbered by Citibank's liens.[3] Ramba had no equity in the proceeds of the sale, and, therefore, the funds never would have been available to general creditors in the bankruptcy.  The Trustee argues that upon Citibank's acceptance of $15.6 million from Patterson, the "assumed liability" portion of the purchase price was converted into unencumbered funds, which presumably Ramba could then distribute to creditors as it wished in the resulting bankruptcy.  This theory fails because there is no evidence that Citibank agreed to create equity for the benefit of Ramba.  The consideration from the sale of Citibank's collateral belonged to Citibank, the secured lender.

The problem with Ramba's lack of equity is illustrated by the remedy the Trustee is requesting.  The Trustee wants a refund of the $10 million paid to the Appellees by Patterson.  By doing so, he essentially is asking for the benefit of the deal with Patterson while cancelling one of the underlying terms of the bargain.  The district court points out that without the debt assumption provision, it is likely that there would never have been a deal with Patterson.  The court opined, "A drilling outfit that has difficulty getting basic materials like mud and care is not an attractive

_____

[3]During oral argument, the attorney for the Trustee admitted that "the debt and the assets are roughly equivalent," describing the assets as "fully encumbered."  Indeed, the record shows that the Trustee stipulated to the fact that "Citibank was owed in excess of the fair market value of the Debtor's total assets."

7

asset." The Patterson transaction was structured so that the drilling division would operate without interruption, as seen by Patterson's choice in adopting the "Ambar" name. The district court found that only one of the Appellees even knew the division had a new owner. The Trustee's request threatens to undo the entire Patterson transaction. Such an undoing would leave Citibank holding liens on the drilling division and the Trustee having an asset that would not benefit general creditors.

The Trustee's reliance on *In re Conard Corporation*, 806 F.2d 610 (5th Cir. 1986), is misplaced. In *Conard*, the debtor sold pizza restaurants to a third party. As part of the transaction, the buyer agreed to assume and be bound by eighty-four installments on an unpaid promissory note. *Id.* at 611. This Court held that those payments were voidable preferences because the assumption of debt provision prevented the debtor's estate from benefitting from a higher selling price. *Id.* *Conard*, however, is easily distinguished. The restaurants were unencumbered at the time of the sale, giving the debtor an equitable interest in the asset. Here, Ramba only held legal title at the time of the Patterson transaction. Had Patterson been willing to pay a higher price for the assets rather than assuming the debt, the increase in funds would have gone to Citibank, not the estate.[4]

---

[4]The Trustee also fails in his argument that the district court and the Appellees misinterpret section 541(d). He says "equitable" as used in section 541(d) only applies to secondary

8

Ramba had no interest in the transferred property other than bare legal title.  This is insufficient for avoiding the transfers to the Appellees.  Because we affirm on this ground, we need not address the district court's holding that the transfers occurred in the ordinary course of business.  Similarly, we need not address alternative arguments presented by the Appellees.[5]

## B.  Direct Transfer to Appellee GeoResources

The Trustee attempts to recover one "direct" payment to GeoResources in the amount of $28,396.83 paid on September 8, 2000.[6] The September payment totaled $31,899.03, but only $28,396.83 is at

---

mortgage situations where a real estate purchaser has paid the full amount due but has not yet received a deed.  *Id.*  He concludes that section 541(d) does not apply to Ramba and relies on section 541(a)(1), which provides that the bankruptcy estate is comprised of "all *legal* and equitable interests."  11 U.S.C. § 541(a)(1) (emphasis added).  The United States Supreme Court and this Court, however, have applied section 541(d) outside the equitable mortgage context.  *See, e.g.*, *Begier v. IRS*, 496 U.S. 53, 59 (1990) (examining trust funds paid to the IRS under section 541(d)); *In re Haber Oil Co., Inc.*, 12 F.3d 426 (5th Cir. 1994) (examining constructive trusts under section 541(d)).  In addition, this Court reads section 541(d) in conjunction with section 541(a)(1) rather than as two distinct, inconsistent provisions.  *In re Maple Mortgage*, 81 F.3d at 595 (explaining that section 541(d) "further explains" section 541(a)(1)).

[5]Appellees argue that the payments are not voidable preferences because Ramba contemporaneously received new value in exchange for the transfers.  Appellees also argue that they did not receive more than they would have under a liquidation, a requirement under section 547(b).

[6]The briefs varied in their descriptions of the direct transfer payments at issue.  At oral argument, the attorney for the Trustee clarified the discrepancies, stating that the Trustee only sought to avoid $28,396.83 of the September payment.

issue.  This payment came directly from Ramba as opposed to being paid by Patterson.

The parties disagree as to whether the GeoResources payment satisfies the Bankruptcy Code's exception for payments made in the ordinary course of business.  The disagreement centers on the timing of the payments and whether the timing met the requirement that the payment be "made according to ordinary business terms."  11 U.S.C. § 547(c)(2)(C).  The record shows that this payment was for invoices more than 180 days old.  The district court found that the industry standard for payment of invoices was 120 days.[7]  Therefore, this issue turns on the sixty-day difference between the industry standard and the actual payment date.

In *In re Gulf City Seafoods, Inc.*, this Court adopted an "objective test" for determining when a credit arrangement is within the ordinary course of business.  296 F.3d 363, 367–68 (5th Cir. 2002).  "[T]he question must be resolved by consideration of the practices in the industry—not by the parties dealings with each other."  *Id.* at 369.  This Court was careful to ensure that the test did not "place businessmen in a straightjacket" by enforcing "strict conformity" to a standard or requiring "identical" credit

_____

[7]The court stated that the parties "admitted" that this was the correct standard.  The Trustee, however, disputes this standard and asserts that he never made such an admission. Whether or not the Trustee ever admitted the standard was 120 days is not significant here.  No fact issue was created as the only summary judgment evidence presented with respect to this issue was that the standard was 120 days.

10

arrangements. *Id.* at 368. Instead, the ordinary business term "sets an outer boundary to the parties' practices" presenting the question of "whether a particular arrangement is so out of line with what others do that it fails" to be ordinary. *Id.* at 369.

The district court found that although the GeoResources payment was "outside the industry standard, [it] reflected historical relations between GeoResources and Ambar." The district court's analysis contradicts the test outlined in *Gulf City Seafoods*. According to the teachings of *Gulf City Seafoods*, the "historical relations" between GeoResources and Ambar should not be the focus of an objective inquiry. The Appellees argue that the payment still satisfies the "ordinary business" requirement, pointing to cases that have held that late payments are not per se "unordinary." *See In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir. 1994); *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991); *In re Yurika Foods Corp.*, 888 F.2d 42, 44 (6th Cir. 1989).

The *Gulf City Seafoods* test allows for some late payments, as seen by its language that warns against enforcing "strict conformity" or requiring "identical" transactions. *Gulf City Seafoods*, 296 F.3d at 368. The question under *Gulf City Seafoods* becomes whether the sixty-day delay fails to be in the ordinary course of business because it is "so out of line with what others do." *Id.* at 369. The GeoResources payment was approximately sixty days late according to its own witnesses. The 180 days it took to

11

pay GeoResources is 150 percent of the industry standard. The Trustee challenges the accuracy of the "120 day" figure, suggesting that in practice it is much shorter. Even under the "120 day" standard, the payment to GeoResources is significantly out of line with what others do. The delay in payment here cannot be deemed ordinary. For these reasons, it fails to be in the ordinary course of business and therefore is a voidable preference.

## VI. CONCLUSION

The district court did not err in its holding that Ramba had no interest in the property transferred during the Patterson transaction. For that reason, the court's judgment that the indirect transfers did not constitute voidable preferences is AFFIRMED. The district court did err in its determination that a direct transfer to GeoResources was made in the ordinary course of business. For that reason, we VACATE the court's judgment that the direct transfer did not constitute a voidable preference and REMAND for a decision consistent with this opinion.

12