In re NORTHPOINT COMMUNICATIONS GROUP, INC., Northpoint Communications, Inc., Northpoint Communications of Virginia, Inc., and Northpoint International, Inc., Debtors.

E. Lynn Schoenmann, Trustee of the Estate of NorthPoint Communications, Inc., Plaintiff,

v.

BCCI Construction Co., aka Brent Construction, Defendant.

Bankruptcy Nos. 01–30125 TC to 01–30128 TC.

Adversary Nos. 03–3051 TC, 03–3034 TC.

United States Bankruptcy Court, N.D. California.

Feb. 12, 2007.

Dennis D. Davis, Goldberg, Stinnett, Meyers and Davis, San Francisco, CA, for Plaintiff.

Ori Katz, Steven B. Sacks, Sheppard, Mullin, Richter and Hampton, William F. Abbott, Law Offices of William F. Abbott, San Francisco, CA, Thomas G.F. Del Beccaro, Del Beccaro, Ratfield, Hornsby and Blake, Walnut Creek, CA, for Defendant.

1. This opinion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr.Proc. 7052.

## OPINION

THOMAS E. CARLSON, Bankruptcy Judge.

The primary issue in this case is whether the defendant established the ordinary-course-of-business defense to the trustee's preference claim. The case presents an interesting and close question regarding one of the elements of that defense: that the payments be "made in the ordinary course of business or financial affairs of the debtor and the transferee." The defendant satisfied this requirement, although the payments departed from past practices between the parties, because the facts and circumstances show that the debtor made the payments in furtherance of its business plan, and not as a result of pressure by the defendant or the debtor's desire to prefer the defendant over other creditors.

## FACTS[1]

Northpoint Communications, Inc. (Northpoint) was an internet service provider that was expanding rapidly, had never made a profit, and was running out of its initial capital by the summer of 2000. In August 2000, Northpoint entered into a merger agreement with Verizon Communications, Inc. (Verizon). On November 29, 2000, Verizon cancelled that merger agreement, throwing Northpoint into an immediate cash-flow crisis.

Northpoint operated from several leased properties in the San Francisco Bay Area. In 1999 and 2000, Northpoint had hired defendant BCCI Construction to create tenant improvements on those leased premises. By the time the Verizon merger collapsed, all of the BCCI construction projects were nearly completed except Emery Station North.

Northpoint believed the leases other than Emery Station North had substantial value, because the contractual rent was below the market rate. Northpoint also believed that the value of these leases was declining rapidly, because the rental market was softening. The Emery Station North lease had no market value, because the contractual rent was not below the market rate.

Taking these considerations into account, Northpoint created a new business plan regarding the affected premises within days after the merger collapsed. Northpoint would attempt to assign quickly the below-market leases and would abandon the Emery Station North project. To this end, Northpoint contacted BCCI in early December 2000, to cancel work on Emery Station North and to obtain a statement of the amounts due on all its projects with BCCI.

On December 12, 2000, BCCI sent a letter to Northpoint expressing concern regarding the cancellation of the Verizon merger, noting that Northpoint owed BCCI and various subcontractors and suppliers $1,469,176, and noting that because the projects were almost complete these parties would be forced to record mechanics liens to preserve their rights if they were not paid by December 30, 2000.

In mid December, BCCI also agreed to attempt to collect payment from Northpoint on behalf of three other entities to whom Northpoint owed money (hereinafter the Third Parties). BCCI was not itself obligated to the Third Parties.

BCCI promised in writing to turn over to the Third Parties any amounts BCCI collected from Northpoint on their behalf.

On December 19th, BCCI sent Northpoint an invoice in the amount of $1,469,176. This amount included the sums Northpoint owed the Third Parties and the sums owed on Emery Station North. At about the same time, Northpoint and BCCI reached an agreement under which Northpoint would pay one-half of the above amount by the end of December and the remainder within 15 days thereafter.

On December 20, 2000, Northpoint sold the lease for its Second Street premises back to the landlord, for a lease-termination fee of $1.5 million, forgiveness of $355,000 past-due rent, and return of a $3.3 million security deposit.

On December 28, 2000, Northpoint paid BCCI $750,000 by wire transfer. On January 12, 2001 Northpoint paid BCCI $304,577.90 by check drawn on Northpoint's payroll account.

■ Northpoint filed a chapter 11 petition in this court on January 16, 2001, and immediately moved to sell substantially all of its operating assets.[2] By order entered March 22, 2001,[3] those assets were sold to AT & T for $135 million. As part of this asset purchase, the leases for Emery Station and Heritage Square were assumed and assigned to AT & T.[4] The leases for Emery Station North and 5915 Hollis

2. Northpoint did not sell its claims against Verizon for breach of the merger agreement, which Northpoint later settled, receiving $175 million.

3. Pursuant to Federal Rule of Evidence 201, the court takes judicial notice of this order, assigned docket number 298, and entitled "Order Under 11 U.S.C. §§ 105, 363, 365 and 1146(c) Approving (A) Asset Purchase Agreement with AT & T Corp.; (B) Sale of Debtors' Assets to AT & T Corp. Free and Clear of All Liens, Claims, Encumbrances and Interests . . . ." etc.

4. The purchase agreement did not allocate any specific part of the purchase price to the assigned leases.

Street were deemed rejected. *See* 11 U.S.C. § 365(d)(4).

In the present action, Trustee seeks recovery of $1,054,578, the sum of the payments Northpoint made to BCCI on December 28, 2000 and on January 12, 2001. Trustee seeks to recover as constructive fraudulent conveyances $204,532 BCCI received on behalf of the Third Parties. Trustee seeks recovery of the remaining $850,046 as preferential transfers.

The historical facts relevant to the fraudulent conveyance claim are not disputed. BCCI introduced uncontroverted evidence that: (1) Northpoint owed the Third Parties the amounts BCCI agreed to collect on their behalf; (2) BCCI contractually promised to pay to the Third Parties any amounts collected on their behalf; and (3) BCCI promptly paid to the Third Parties the amounts collected on their behalf. The dispute between the parties regarding the fraudulent conveyance claim concerns the meaning of these historical facts. More specifically, the parties dispute whether BCCI was a "transferee" or a "mere conduit" regarding the Third Party payments.

The facts relevant to the Trustee's case-in-chief regarding her preference claims are also largely undisputed. BCCI stipulated that the payments were: (1) paid by Northpoint; (2) paid in satisfaction of an antecedent debt to BCCI; and (3) paid within 90 days before Northpoint's bankruptcy. This court determined in a prior proceeding that Northpoint was insolvent at all times relevant here. BCCI did not stipulate that the payments enabled BCCI to receive more than it would have in a chapter 7 liquidation, but BCCI did not controvert Trustee's evidence that general unsecured creditors would not be paid in full in a chapter 7 case.

The primary dispute regarding the preference claim is whether BCCI proved the elements of the ordinary-course-of-business defense or the subsequent-new-value defense.

In addition to the facts already noted above, the evidence established the following facts relevant to the ordinary-course defense.

Before the 90–day preference period, Northpoint paid BCCI in the following manner. Northpoint agreed to pay invoices within 30 days, but in practice made payments from 19 to 135 days after invoice. Payments were made by check drawn on Northpoint's operating account, never by wire transfer or payroll check. A payment check often covered many invoices of different ages. BCCI never sent follow-up statements regarding amounts past due.

During the 90–day preference period, Northpoint paid BCCI in the following manner. Invoices were paid from 0 to 95 days after invoice, except one payment of $607, made 286 days after invoice.[5] Northpoint made one payment by wire transfer and one payment by check on its payroll account. Both payments covered many invoices of differing ages. Both payments were made after BCCI learned of the cancellation of Northpoint's merger with Verizon. Both payments were made shortly after BCCI sent a letter to Northpoint requesting payment on past-due amounts and stating that BCCI and various suppliers and subcontractors would record mechanics liens against the affected properties if Northpoint did not pay the amounts due promptly.

BCCI introduced uncontroverted testimony that: (a) Northpoint owed BCCI the amounts BCCI claimed for construction work performed; (b) BCCI could have as-

---

**5.** Another payment was made 184 days after invoice, but this payment was later reversed.

serted mechanics liens against the affected real properties if it was not paid for that construction work; (c) BCCI would have timely asserted its mechanics lien rights; and (d) BCCI's assertion of mechanics liens would constitute a default by Northpoint under its real property leases on Second Street, Emery Station, Heritage Square, and Hollis Street.

BCCI applied the $750,000 received on December 28, 2000 to Northpoint's outstanding obligations as follows.

| AMOUNT | PROJECT | COMMENT |
| --- | --- | --- |
| $ 41,945.00 | Doyle Street | Payment later reversed. |
| $647,363.90 | Emery Station & Heritage Square | Leases assumed and assigned to AT & T. |
| $ 27,152.00 | Second Street | Lease sold pre-petition. |
| $ 7,204.00 | 5915 Hollis Street | No assignee found and lease rejected in AT & T purchase. |
| $ 26,335.10 | Emery Station North | Project cancelled and lease rejected. |

From the $304,578 BCCI received on January 12, 2000, BCCI paid the Third Parties $204,532, and applied the remaining $100,046 to Northpoint's outstanding obligations as follows.

| AMOUNT | PROJECT | COMMENT |
| --- | --- | --- |
| ($ 41,945.00) | Doyle Street | Reversal of 12/28/00 payment. |
| $130,576.50 | Emery Station & Heritage Square | Leases assumed and assigned to AT & T. |
| $ 11,414.90 | Emery Station North | Project cancelled and lease rejected. |

BCCI introduced no evidence that it provided new goods or services to Northpoint after December 28, 2000 for which it was not paid.

## I.

### PREFERENCE CLAIM

### TRUSTEE'S CASE–IN–CHIEF

BCCI declined to stipulate that it received more through the transfers in question than it would have received had it not received the transfers and instead been paid in a chapter 7 liquidation. 11 U.S.C. § 547(b)(5). Trustee established that general unsecured claims would not be paid in full in a chapter 7 liquidation. This is sufficient to satisfy the "more-than" test, if BCCI would have been limited to a general unsecured claim. *Elliott v. Frontier Properties/LP 102/Meadow Glen Arms/79 (In re Shurtleff, Inc.)*, 778 F.2d 1416 (9th Cir.1986). BCCI did not argue that it would have had more than a general unsecured claim.[6]

---

6. Although BCCI did not raise this argument, it is far from clear that BCCI would have been treated only as a general unsecured creditor on its claims for work related to leases that were later assumed or sold back to the landlord. The claim for unpaid pre-petition rent of a landlord whose lease has been assumed in the bankruptcy case is the equivalent of a secured claim that must be paid in full, because that claim represents a default under the lease that must be cured before the lease may be assumed. *Alvarado v. Walsh (In re LCO Enterprises)*, 12 F.3d 938, 942 (9th Cir.1993). In may be that BCCI's claims for works of improvement on premises covered by leases that were later assumed should be evaluated in the same manner as the hypothetical pre-petition rent claims at issue in *LCO Enterprises*. This is so, because Northpoint owed payment directly to BCCI, and because failure to pay BCCI's claims would have constituted a default under the lease that would have to be cured before the lease could be assumed. BCCI may also have a secured claim on Northpoint's leaseholds for any unpaid works of improvement on the leased premises. Cal. Civ. C. § 3129. I do not decide this issue, because I determine that the ordinary-course-of-business defense applies to all but $607 of the payments related to leases that were sold before the bankruptcy petition or that were assumed in the bankruptcy case.

## ORDINARY–COURSE DEFENSE

■ To establish the ordinary-course-of-business defense, BCCI must prove three elements: (A) that the debts paid were incurred in the ordinary course of business; (B) that the payments were made in the ordinary course of business between the parties; and (C) that the payments were made according to terms that are ordinary within the industry in question. 11 U.S.C. § 547(c).[7]

### A. Debt Incurred in Ordinary Course

Trustee stipulated that Northpoint's debts to BCCI were incurred in the ordinary course of Northpoint's business.

### B. Ordinary Course of Business Between the Parties

This case presents a close question regarding the second element of the ordinary-course defense: whether the transfers in question were ordinary when compared with prior dealings between Northpoint and BCCI.

The relevant statutory language provides limited guidance for resolving this question. It states only that the transfer must be "made in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(B).

The legislative history explains the overall purpose of section 547 as follows.

> The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dis-

member the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

H.R.Rep. No. 95–595, pp. 177–78 (1977), U.S.Code Cong. & Admin. News 1978, pp. 6137, 6138.

The legislative history states that the ordinary-course-of-business defense was intended to

> leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 95–595, p. 373 (1977), U.S.Code Cong. & Admin. News 1978, p. 6329.

The Supreme Court has stated that the ordinary-course-of-business defense furthers the policy of preventing "dismember[ment]" of the debtor during his slide into bankruptcy," by enabling the debtor to make unavoidable payments that enable "the struggling debtor to continue operating its business." *Union Bank v. Wolas,* 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). In holding that the ordinary-course defense can be applied to

---

7. This case is governed by the law applicable before the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, because the underlying bankruptcy case was filed before October 17, 2005. Under current law, the defendant need only show that the debt paid was incurred in the ordinary course of business, and *either* that the payment was made in the ordinary course of business between the parties *or* that the payment was made according to business terms ordinary in the industry. 11 U.S.C. § 547(c)(2).

payments on long-term debt, the Court rejected the argument that the ordinary-course defense should be construed narrowly because it undermines the policy of equal treatment.

> On the one hand, any exception for a payment on account of an antecedent debt tends to favor the payee over other creditors and therefore may conflict with the policy of equal treatment. On the other hand, the ordinary course of business exception may benefit all creditors by deterring the "race to the courthouse" and enabling the struggling debtor to continue operating its business.

*Id.* (quotation in original).

■ The Ninth Circuit has identified four factors that trial courts should consider in determining whether a payment was in the ordinary course of business between the parties:

> 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and, 4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir.1994).

*Grand Chevrolet* does not provide all the guidance a trial court might desire, however, because the court stated expressly that its list of relevant factors is not exclusive, and because the court did not provide any guidance for determining what other factors might be considered. *Id.* More important, *Grand Chevrolet* does not explain how the identified factors are to be employed. Does *Grand Chevrolet* establish an objective test, under which the identified factors themselves define ordinariness, or did the court determine only that the identified factors are relevant to some broader test of ordinariness?

The Bankruptcy Court for the Southern District of New York has stated that the goal in comparing dealings before and during the preference period is to determine whether the transfers during the preference period resulted either from unusual pressure exerted by the creditor or from the debtor's desire to prefer the transferee over other creditors. *Abovenet, Inc. v. Lucent Technologies, Inc. (In re Metromedia Fiber Network, Inc.)*, 2005 WL 3789133 (Bankr.S.D.N.Y.2005). The court held that payment pursuant to a pre-bankruptcy workout, for which there was no precedent between the parties, was nonetheless within the ordinary course of business between the parties, because the facts and circumstances indicated that the transfer did not result from either of the proscribed purposes identified immediately above. *Id.* at *7.

■ I conclude that a trial court should consider, in addition to the factors identified in *Grand Chevrolet*, any other facts that shed light on whether or not the transfer in question resulted from pressure by the transferee or from the debtor's desire to prefer the transferee over other creditors. Furthermore, the court should examine the facts not only to determine the extent to which the transfer outwardly conforms with past practices between the parties, but also to determine whether the transfer was the product of either of the proscribed purposes noted above. There may be instances in which the objective characteristics of the transfer are so different from the prior dealings between the parties that the transfer should not be considered to be within the ordinary course of business between the parties, despite evidence that the transfer was not the product of creditor pressure or the debtor's desire to prefer the transferee

over other creditors. Such instances, however, should be limited to those in which the departure represents an aberration in the course of dealing between the parties. *Cf. Bank of the West v. Anderson (In re Jan Weilert RV, Inc.)*, 315 F.3d 1192 (9th Cir.2003)(adopting similar approach to "ordinary business terms" requirement of section 547(c)(2)(C)), *amended in part by* 326 F.3d 1028 (9th Cir.2003).

 In furtherance of the approach just described, I take account of the following facts in determining whether the payments in question were within the ordinary course of business between Northpoint and BCCI.

(1) *Relation of payments to ongoing business activity.* Northpoint paid BCCI on the Heritage Square, Emery Station, Second Street, and Hollis Street projects for the purpose of facilitating the assignment of Northpoint's leases on those premises. Immediately after cancellation of the Verizon merger, Northpoint determined that those leases had value, and decided to complete the tenant improvements and to preserve those leases for assignment.[8] Each of the leases required Northpoint not to cause any mechanics liens to be filed against the property. Any party purchasing Northpoint's leaseholds would require that all potential mechanics liens be released. The payments to BCCI regarding the Heritage Square, Emery Station, Second Street, and Hollis Street projects enabled Northpoint to obtain mechanics lien releases, and thus facilitated the assignment of those leases.

In contrast, Northpoint's payments to BCCI on the Emery Station North project did not facilitate the assignment of the related lease. Immediately after cancellation of the Verizon merger, Northpoint determined that this lease had no value, and cancelled all work on the project. The Emery Station North lease was rejected promptly in Northpoint's chapter 11 case.

(2) *Timing of payments.* Before the preference period, Northpoint paid BCCI from 19 to 135 days after invoice. During the preference period, payment were made from 0 to 95 days after invoice, except for one payment of $607 made 286 days after invoice.[9] Thus, none of the payments in question were unusually late; some were unusually early.

(3) *Unusual collection activity.* BCCI sent a letter requesting full payment on all outstanding projects shortly after it learned of the cancellation of the Verizon merger, and shortly after Northpoint had contacted BCCI requesting a summary of all amounts due. The letter stated that BCCI and various suppliers would record mechanics liens if not paid promptly. BCCI had not sent any letters or statements regarding overdue invoices before the preference period.

(4) *Amount and method of payment.* Both before and during the preference period, Northpoint issued checks that covered multiple invoices on multiple projects. Before the preference period, all payments were made by check drawn on Northpoint's operating account. During the preference period, all payments were made

8. The Second Street lease was assigned back to the landlord for $1.5 million, plus release of a $3.3 million security deposit and forgiveness of $335,000 past-due rent. The Heritage Square and Emery Station leases were assigned to AT & T as part of the sale of Northpoint's operating assets for $135 million. The Hollis Street lease was rejected after AT & T declined to purchase it. *See supra,* p. 155 and *infra* n. 11.

9. This court finds that the $607 payment was not made according to ordinary business terms. *See infra,* part I.C.

by wire transfer or by check drawn on Northpoint's payroll account.

(5) *Whether BCCI took advantage of Northpoint's deteriorating financial condition.* There are no facts, other than those already noted in paragraphs (2)-(4) immediately above, relevant to whether or not BCCI used Northpoint's deteriorating financial condition to obtain the payments in question from Northpoint.

Upon consideration of all of the factors identified above, I find that BCCI proved that the payments on the Heritage Square, Emery Station, Second Street, and Hollis Street projects were within the ordinary course of business between the parties. I find that these payments did not result either from unusual collection action by BCCI or from any intent of Northpoint to prefer BCCI over its other creditors. BCCI did engage in some unusual collection activity, in that it had never before sent a letter regarding an overdue invoice. That letter, however, stated only the obvious about the preservation of mechanics lien rights,[10] did not threaten work stoppage or legal action, and its importance is lessened by the fact that shortly before Northpoint itself had requested a summary of all amounts due. That some invoices were paid immediately after receipt, and that all the payments in question were paid by wire transfer or from a payroll account, suggests that BCCI succeeded in causing Northpoint to use all available means to pay promptly. The importance of this factor is offset, however, by the fact that prompt payment allowed the potential mechanics liens to be cleared quickly as the projects were completed, furthering Northpoint's plan to assign the related

leases promptly. I find that Northpoint would have made the payments on the Heritage Square, Emery Station, Second and Hollis Street projects in the absence of any pressure from BCCI, and that Northpoint's intent was not to prefer BCCI over other creditors, but to facilitate the preservation of its valuable leases.[11] The payments on those projects also did not depart so significantly from past practices as to represent an aberration in the dealings between Northpoint and BCCI.

BCCI did not prove that the payments on the Emery Station North project were within the ordinary course of business between the parties. The payments on the other projects were ordinary because they were so obvious to Northpoint's business plan of preserving valuable leases on those premises. The payments on the Emery Station North project did not further that business plan, except insofar as they were intended to mollify BCCI. Keeping one creditor happy by paying that creditor, while similarly situated creditors remain unpaid, is precisely the type of action that the preference statute is intended to discourage. Stated differently, absent the clear and legitimate business justification for payments intended to preserve valuable leases, evaluation of the *Grand Chevrolet* factors precludes a finding that the that transfers were in the ordinary course of business between the parties. I find that while Northpoint made the payments on the Heritage Square, Emery Station, Second, and Hollis Street Street projects freely and in furtherance of its own legitimate purposes, Northpoint made the payments on the Emery Station North project primarily to

---

10. The letter noted that because the projects were almost complete, the short time limits for recording mechanics liens would soon begin to run.

11. That the Hollis Street lease was later rejected does not change the purpose of the payment at the time it was made. The evidence indicates that Northpoint attempted to assign this lease for value, but that AT & T was not interested in purchasing it.

avoid any trouble from BCCI regarding the prompt release of mechanics liens on the former projects.

## C. Ordinary Business Terms

■■■ BCCI must prove that the payments in question were ordinary in relation to prevailing business practices in the relevant industry. 11 U.S.C. § 547(c)(2)(C) (transfer must have been made "according to ordinary business terms").

The Ninth Circuit has stated that in applying this test,

"the court must look to those terms employed by similarly situated debtors and creditors facing the same or similar problems," creditors are not required to prove a particular uniform set of business terms, rather, "ordinary business terms" refers to the *broad range* of terms that encompasses the practices employed by those debtors and creditors, including terms that are ordinary for those under financial distress. Only a transaction that is so unusual or uncommon "as to render it an aberration in the relevant industry," falls outside the broad range of terms encompassed by the meaning of "ordinary business terms."

*Jan Weilert, supra,* at 1198 (citations omitted) (emphasis and quotation marks in original).

BCCI has established that all but $607 of the alleged preferential payments were made "according to ordinary business terms" as interpreted in *Jan Weilert.* BCCI's expert witnesses testified that none of the salient characteristics of the payments in question were unusual in the relevant industry. It was not unusual for a financially troubled company in the tele-

communications industry to make payments on a large contract by wire transfer or by check drawn on a payroll account. It was not unusual for a construction company to send with its invoice a notice that it would exercise its mechanics lien rights if not timely paid, especially as the project was completed and mechanics lien rights must be promptly asserted or lost. It was not unusual for payments on a construction contract to be made 95 days after invoice. It was not unusual for a lessee to make payments on a tenant-improvement contract immediately after invoice, where the project was substantially complete, the lessee intended to assign its leasehold, and the lessee would default under the lease by causing a mechanics lien to be filed against the property. Trustee submitted no contrary evidence. Only the $607 payment 286 days after invoice falls outside the "broad range of terms that encompasses the practices employed by" lessees and contractors making tenant improvements for those lessees.

## NEW–VALUE DEFENSE

■■■ To establish a new-value defense under section 547(c)(4), BCCI must show that: (1) it advanced new value to Northpoint after the preferential transfer; (2) that the advance of new value was unsecured; and (3) that the advance of new value remains unpaid. *Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.),* 52 F.3d 228, 230 (9th Cir.1995).

BCCI did not establish the new-value defense, because it failed to show that it provided to Northpoint after December 28, 2000 any goods or services that it was not paid for.[12]

BCCI argues that all of the payments in question were part of a single transaction, and that all of the benefits from the sale

---

**12.** The new-value defense has importance only in regard to the payments made on the Emery Station North project and $607 tardily

paid on Heritage Square, because BCCI established the ordinary-course defense with re-

of the Second Street lease represent new value produced by those payments. This argument is unpersuasive, because it proceeds upon the assumption that Northpoint could not have sold the Second Street lease without obtaining lien releases on all the BCCI projects. BCCI introduced no evidence of any cross-default provisions under which BCCI could lawfully have withheld lien releases regarding the Second Street project if Northpoint failed to make payments on other projects.

## AMOUNT DUE ON PREFERENCE CLAIM

Trustee has established the elements of her case-in-chief with respect to the entire $850,046 BCCI received in payment of its own claims against Northpoint.[13] BCCI has established the ordinary-course-of-business defense with respect to $811,689 received for the Second Street, Emery Station, Heritage Square and Hollis Street projects. BCCI did not establish the ordinary-course defense with respect to the $37,750 received for the Emery Station North project or the $607 received for the Heritage Square project 286 days after invoice. BCCI did not establish the elements of the new-value defense of subsection 547(c)(4) with respect to any of the payments.

Trustee is thus entitled to recover $38,357, plus $8,060.64 prejudgment interest.[14]

## II.

## FRAUDULENT CONVEYANCE CLAIM

■■■■ To recover the Third Party Payments as constructive fraudulent con-

veyances, Trustee must establish that BCCI was a "transferee" of those payments, that the payments were made while Northpoint was insolvent, and that Northpoint did not receive reasonably equivalent value for those payments. 11 U.S.C. § 548(a)(1)(B). Satisfaction of a valid obligation constitutes reasonably equivalent value. 11 U.S.C. § 548(a)(2)(A). A party is not a "transferee" from whom a trustee may recover, if that party does not have the right to use the funds received for its own purposes, but instead is subject to a contractual duty to transfer the funds to another party. *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544, 549 (9th Cir.1991).

■■■■ Trustee is entitled to no recovery on her fraudulent conveyance claim against BCCI. First, BCCI was not a transferee of the payments received for the Third Parties, because BCCI was under a contractual obligation to transfer all such funds to the Third Parties. Second, Northpoint received reasonably equivalent value for the Third Party Payments, because the payments were promptly transferred to the Third Parties in satisfaction of Northpoint's obligations to those Third Parties. *See Tidwell v. Galbreath (In re Tidwell)*, 207 B.R. 309, 324–25 (Bankr. M.D.Ga.1997).

## CONCLUSION

BCCI prevailed in its ordinary-course-of-business defense with respect to all of the payments at issue, except the $37,750 paid on the Emery Station North project

---

**13.** As noted above, the court does not address whether the "more-than" test is affected by the subsequent assumption and assignment of spect to all other alleged preferential payments.

leases, because it does not materially affect the result.

**14.** Prejudgment interest is calculated at 5.10 percent, the rate calculated under 28 U.S.C. § 1961(a).

and the $607 tardily paid on the Heritage Square project. BCCI did not establish the new-value defense regarding those payments, because BCCI failed to show that after receiving those payments it provided any goods or services for which it was not paid. Trustee is not entitled to recover on her fraudulent conveyance claim, because BCCI was not a "transferee" of the payments received for the Third Parties, and because the estate received reasonably equivalent value for those payments.